Aubrey B. LANK, as Receiver of Pickard & Company, Incorporated, Plaintiff-Appellee,

v.

The NEW YORK STOCK EXCHANGE, Defendant-Appellant.

No. 259, Docket 76–7243.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1976.

Decided Jan. 20, 1977.

William F. Tueting, New York City (Robert S. Carlson, Gregory Katz, Robert D. Marafioti and Spengler, Carlson, Gubar, Churchill & Brodsky, New York City, on the brief), for plaintiff-appellee.

Russell E. Brooks, New York City (Martha G. Bannerman and Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for defendant-appellant.

Before MEDINA, OAKES and GURFEIN, Circuit Judges.

MEDINA, Circuit Judge:

The New York Stock Exchange appeals from a judgment of the United States District Court for the Southern District of New York, on questions certified by Judge Morris E. Lasker, pursuant to 28 U.S.C. Section 1292(b). The opinion below is reported, 405 F.Supp. 1031 (S.D.N.Y.1975). The principal issue before us is whether a member of a national securities exchange has a cause of action against the exchange for damages suffered as a result of the exchange's failure to force the member to comply with the exchange's rules. We hold that it does not.

I

In December 1971 appellee Aubrey Lank commenced this suit against the New York Stock Exchange for violations of Section 6 of the Securities Exchange Act of 1934.[1] Lank is the receiver of Pickard & Company, Incorporated, a defunct brokerage firm which, until it ceased business and began liquidation in February 1968, was a member organization of the Exchange. Pickard, a Delaware corporation, had registered with the Securities and Exchange Commission as a broker-dealer in 1962 and as an investment advisor in 1964. The Exchange is a not-for-profit corporation incorporated under the laws of New York and registered with the SEC as a national securities exchange pursuant to the Exchange Act. At all times relevant to this suit, the Exchange was an unincorporated association existing under the laws of New York.

As a result of an annual unannounced audit begun in September 1967 by an independent public accountant, as required by Exchange Rule 418, the Exchange learned in January 1968 of substantial deficiencies and inaccuracies in Pickard's books and records. The Exchange imposed restrictions on Pickard beginning in February 1968. The firm was liquidated shortly thereafter when attempts by the Exchange to put Pickard's records in order proved unsuccessful.[2] In May 1968 the Exchange's chief examiner was appointed liquidator to

---

1. At all times relevant to this action, Section 6, 15 U.S.C. Section 78f, read, in pertinent part:

(a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided in this section, by filing a registration statement in such form as the Commission may prescribe, containing the agreements, setting forth the information, and accompanied by the documents, below specified:

(1) An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this chapter, and any amendment thereto and any rule or regulation made or to be made thereunder;

\* \* \* \* \* \*

(b) No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this chapter or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade.

\* \* \* \* \* \*

(d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this chapter and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange.

\* \* \* \* \* \*

2. Lank asserts that the inability to put Pickard in order resulted from the Exchange's refusal to enforce its rules against Pickard at a time when enforcement could have saved the firm.

take control of Pickard and wind up its business. Serious wrongdoing by certain of Pickard's officers and employees, including its president and vice-president, was discovered. They were found to have violated numerous securities laws and rules, as well as several Exchange regulations.

In March 1969 the Exchange successfully petitioned in Delaware (where Pickard was incorporated) for the appointment of a receiver. At that time the Exchange claimed it was the only remaining general creditor of Pickard, although in the instant suit Lank has asserted that there are approximately thirty other unpaid general creditors, with claims in excess of $100,000. The other claimants of Pickard's assets are subordinated lenders and stockholders.

Lank was appointed receiver in April 1969, and commenced this action on December 17, 1971. With the permission of the Delaware Chancery Court, he had earlier sought to present the same claims as a counterclaim against the Exchange in the Delaware receivership proceeding in 1971, but the Delaware court, upon the Exchange's motion, dismissed the counterclaim on the ground that exclusive jurisdiction for a claim under the Exchange Act lay in the federal courts. *New York Stock Exchange v. Pickard & Co., Inc.*, 282 A.2d 651, 652 (Del.Ch.1971). In the District Court the Exchange counterclaimed against Lank for the same amount it had sought in the receivership proceeding. This counterclaim is not before us.

The essence of Lank's complaint is that as a result of the Exchange's violations of Section 6 of the Exchange Act, Pickard's customers, subordinated lenders, stockholders, and creditors who advanced money to Pickard after October 1966 suffered substantial losses. He alleges that as early as October 1966 the Exchange knew or should have known that Pickard was in violation of various Exchange rules, and had the

Exchange fulfilled its Section 6 duties to enforce compliance with those rules by suspending Pickard from membership, the losses suffered by Pickard's customers, subordinated lenders, stockholders, and creditors would have been prevented.

The Exchange sought dismissal of the complaint and summary judgment, both for "lack of capacity" of the receiver to raise these claims on behalf of Pickard against the Exchange, and because the action was barred by the applicable statute of limitations. The District Court granted the motion to dismiss "for lack of capacity" only those claims Lank sought to assert on behalf of third parties—Pickard's creditors, subordinated lenders and stockholders. In all other respects the motion was denied.

Recognizing that the questions of whether Lank could sue the Exchange and of the time within which such a suit could be commenced were novel and "involve * * controlling question[s] of law as to which there is substantial ground for difference of opinion," Judge Lasker, upon the Exchange's motion, certified two questions for immediate review by this Court, pursuant to 28 U.S.C. Section 1292(b):[3]

(1) Whether the receiver of a former member corporation of the [New York Stock] Exchange has standing (or alternatively capacity) to assert a claim against the Exchange under Section 6 of the Securities Exchange Act of 1934 on behalf of the member corporation, and

(2) Whether a three-year or six-year statute of limitations is applicable to the receiver's claim under Section 6.

The District Court held that the receiver "has standing" to assert a Section 6 claim against the Exchange both because the corporation itself could have done so and because "the ultimate beneficiaries of any recovery by [him] are third parties who share no culpability for Pickard's wrongdoing and ultimate demise" (*id.* at 1039). It further

---

Because of our view of the case as expressed in this opinion it is not necessary to consider the merits of this claim.

**3.** Endorsement, 71 Civ. 5525, April 15, 1976, Joint Appendix 245a–246a; Counter-Order,

dated April 26, 1976, Joint Appendix 247a–248a.

held that New York's six-year statute of limitations for actions upon a contract applies in a suit for violations of Section 6, since the plaintiff sues as a third party beneficiary of the agreement the Exchange was required to file when it registered with the SEC.

We note that in the hurly-burly and rush of litigants to make their way into the already overcrowded courts it is not surprising that not only the niceties but also the very fundamentals of rules of practice and procedure are pushed aside. Indeed, there are many who consider these rules to be "technicalities" to be disregarded whenever possible in the interest of speedy and inexpensive justice. We protest against this trend and would remind those who choose to listen that without rules of procedure all litigation degenerates into chaos. Rules of procedure are intended: to give orderliness and stability to court proceedings; to achieve certainty and to prevent confused reasoning, that great enemy of justice everywhere. At the heart of this case is Section 6 of the Exchange Act. We must decide whether or not appellee has stated a cause of action or "claim for relief" against the Stock Exchange, and this depends upon the way we interpret Section 6. Capacity to sue has nothing to do with this problem. Moreover, we are at a loss to understand what is meant here by the reference to appellee's "standing." Fuzzy thinking is apt to follow the inaccurate use of procedural phrases with clear and precise historical meanings. These phrases are part and parcel of procedure itself. But there is plenty of precedent for the somewhat indiscriminate use of these words in various contexts in recent years and they cause no confusion in this case.

## II

The primary purpose of the Exchange Act was to protect customers of the stock exchanges—that is, public investors. One method of effectuating this was to impose on the exchanges a statutory duty "to pro-

tect investors by regulating [the exchanges'] members." Note, *Exchange Liability for Net Capital Enforcement*, 73 Col. L.Rev. 1262, 1264 (1973).

At all times relevant to this action, Section 6(a) of the Exchange Act required an exchange to agree, as a prerequisite to its registration with the SEC as a national securities exchange, "to comply, and to enforce so far as within its powers compliance by its members, with the provisions of" the Exchange Act and SEC and exchange rules and regulations;[4] Section 6(b) requires an exchange to formulate and enforce rules for disciplining and suspending members; and Section 6(d) states in terms that the purpose of these requirements is "to insure fair dealing and to protect investors." In *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), this court held that when an exchange breaches the duty prescribed by Section 6 to enforce its rules, a private right of action arises in favor of public investors. Judge Clark, whose opinion, though dissenting on the element of burden of proof, set forth the rationale of the court, characterized the implication of such a private right of action as necessary to effectuate the Congressional purpose of protecting public investors, the class Congress intended the statute to protect.

> One of the primary purposes of Congress in enacting the Securities Exchange Act of 1934 was to protect the general investing public. * * * [I]f the investing public is to be completely and effectively protected, § 6(b) must be construed as granting to injured investors individual causes of action to enforce the statutory duties imposed upon the exchanges.

141 F.2d at 244–245.

■ Judge Clark recognized, however, that not every person who might be injured by an exchange's dereliction would have a cause of action.

> It is well established that members of a class for whose protection a statutory

**4.** The 1975 amendments to Section 6 eliminate the statutory requirement of an agreement.

Those amendments, which took effect December 1, 1975, have no bearing on this case.

duty is created may sue for injuries resulting from its breach * * *.

*Id.* at 245. This long established rule is: that before a private right of action may be inferred the would-be plaintiff must show that he is within the class the statute is intended to protect, and that it is not sufficient merely to show that the defendant is within the class the statute is designed to regulate. This rule has been recently reaffirmed by the Supreme Court. *See, e. g., Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Even were we to agree with appellee that granting him a right of action against the Exchange would "accord" with the purpose of the Exchange Act, our function here is to discern the intent of Congress, not to legislate in its place. Thus, while Lank demonstrates that the Exchange Act was designed to regulate the securities exchanges, this obviously correct proposition has little to do with the threshold question in this case: for the benefit of whom was such regulation intended?

■ The beneficiary of the 1934 legislation was intended to be the public investor. One finds in the Act and its legislative history no indication of intention to benefit members of the exchanges at the expense of the exchange itself. The statement presented by Senator Fletcher, Chairman of the Senate Committee on Banking and Currency, in introducing S. 2693, an earlier version of the bill which became the Exchange Act, said:

The bill just introduced for the regulation of securities exchanges is one of the series of steps taken and to be taken for the purpose of bringing safety to the general public in the field of investment and finance. * * *

It is in the light of the interests of the general public that the bill was drawn. * * *

* * * * * *

The purpose of the bill is to insure to the public that the securities exchanges will be fair and open markets. The bill seeks to protect the American people by requiring brokers on these exchanges, members of these exchanges, to be wholly disinterested in performing their services * * *.

78 Cong.Rec. 2264, 2270–2271 (1934). The report of the House Committee on Interstate and Foreign Commerce accompanying the Securities Exchange Bill of 1934 stated, in emphasizing the need to protect the public investor:

The bill proceeds on the theory that the exchanges are public institutions which the public is invited to use * * *, and are not private clubs to be conducted only in accordance with the interests of their members. The great exchanges of this country upon which millions of dollars of securities are sold are affected with a public interest in the same degree as any other great utility.

H.R. Report Number 1383, 73d Cong., 2d Sess. 15 (1934).

There is no indication whatsoever that members of the exchanges were considered to be within the class of public investors Section 6 of the Act was designed to protect.

Since *Baird v. Franklin, supra*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), the scope of "investors" has been slowly expanded through judicial construction to include even limited partners and subordinated lenders of member organizations of an exchange, as in *New York Stock Exchange v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975). The Ninth Circuit has agreed with the view expressed in *Sloan* that subordinated lenders and limited partners of brokerage firms "have standing" to bring private actions for violations of Section 6. *Hughes ,v. Dempsey-Tegeler & Co., Inc.*, 534 F.2d 156, 165 n. 4 (9th Cir.), *cert. denied*, 97 S.Ct. 259 (1976). *Hughes*, however, did not make an independent analysis of the legislative history or purpose behind the regulation of stock exchanges, nor did it seek to determine whether subordinated lenders and limited partners were within the class in whose behalf a cause of action could be inferred,

and that specific issue is not before us in this case.

■ The court in *Hughes* found nothing to "mandate a reversal of the long standing rule that a private right of action is available under Section 6." 534 F.2d at 166 n. 5. Nor do we. The issue in this case, however, is not whether the rule allowing a private right of action should be reversed, but whether it should be extended.

In *New York Stock Exchange v. Sloan, supra*, the court said:

> [The limited partners and subordinated lenders] clearly have a large stake in the enforcement of the rules. Because their status requires them to rely on the general partners both to manage the enterprise and to comply with the * * * rules, they are entitled to the Exchange's diligent enforcement of them. ·

394 F.Supp. at 1310–1311. In the instant case, after quoting this passage, Judge Lasker went on to say:

> A corporation, like the customers, subordinated lenders and limited partners of a brokerage firm, is required by its status to rely on those responsible for the management of the firm to comply with the net capital rule and is therefore entitled to the Exchange's diligent enforcement. A brokerage corporation as an entity is more than its officers and directors. It is also capable of sustaining damages as a result of violations of the securities laws and regulations and the rules of the Exchange by those charged with its day to day control. In such circumstances a corporation is entitled to the benefits and protection of § 6 and has standing to sue accordingly.

405 F.Supp. at 1037. Belying this rationale, however, is the fact that there is nothing in the language or legislative history of the Exchange Act to indicate that Congress intended the protection of Section 6 to reach everyone who might rely on the Exchange's enforcement or suffer injury due to lack of it.

The cases relied upon by Judge Lasker in extending exchange liability to member organizations all sought to effectuate the purpose of Section 6. But that purpose was to protect public investors. Their interests may often be antagonistic to those of exchange members, and it could well have a serious disruptive effect on the securities industry and the national economy itself were we to require an exchange so to enforce its rules as to avoid possible risk to its own members and their creditors and stockholders in such a way that the interests of the public investors, paramount in the legislative scheme, are disregarded.

■ Thus we conclude that it was the intention of Congress to draw a clear line of demarcation between public investors, on the one hand, who may assert claims against a stock exchange for damages arising out of violations of Section 6, and, on the other hand, members of those exchanges, who may not. The Congress did not enact Section 6 for the purpose of affording protection to the very members of the stock exchanges whose conduct was being regulated at the expense of those exchanges. We therefore hold that a securities exchange is not liable to a member organization for failure to force the member to comply with the exchange's rules.

■ As to whether the receiver may sue, we are of the opinion that if the member has no cause of action, its receiver also has none.[5] In the order appointing him, Lank was given only those powers contained in the Delaware receivership statute, 8 Del. Code Annot. Section 291. In particular, he was authorized to:

> take charge of the estate and effects, business and offices of said corporation, and to collect the outstanding debts, claims, and property due and belonging to the said corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all claims or suits * * * and to do all other acts

---

5. It should be noted that no member firm of the Exchange was a corporation until 1953 when Exchange Rules were revised to permit corporations to become members. Until then the question of Section 6 liability to a corporate member's receiver could not have arisen.

which might be done by the corporation, if in being, that may be necessary and proper[.]

*New York Stock Exchange v. Pickard & Company, Inc.*, Civil Action No. 2997 (Del. Ct.Ch., April 22, 1969).

 A receiver stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted. While it is true that where he represents the creditors as well as the estate, he may sometimes sue in that right where the estate could not, 75 C.J.S. *Receivers* § 325 (1952); 16 Fletcher, *Cyclopedia of Corporations* Section 7847 (1962), on this appeal Lank makes no claim to assert as receiver a right not belonging as well to a corporate member of the Exchange. Indeed the court below recognized that the issue in this case is "whether Pickard has a cause of action against the Exchange under § 6 of the Securities Exchange Act on which the receiver may sue." 405 F.Supp. at 1036.

Nonetheless, the court then rejected the Exchange's argument that the receiver could not sue because Pickard was the primary wrongdoer—a contention we need not consider—on the ground that where the receiver sues to maximize the pool of corporate assets out of which creditors can be satisfied, he may sue where the corporation could not. However, the fact that a receiver could sue a transferee to recover a fraudulent transfer made by the corporation, even though the corporation itself could not, is of no moment here. Since the member corporation may not sue the exchange, neither may its receiver or its creditors, for the latter cannot bring themselves within the protected class. To the extent that a receiver's recovery in a Section 6 suit would benefit public investors, as was suggested in the opinion below, 405 F.Supp. at 1037, those investors already have a cause of action in their own right under *Baird v. Franklin, supra*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), and the receiver's suit would add nothing to their rights. To allow the receiver to sue as representative of the corporation's creditors would be to allow the corporation itself to sue, for ultimately the recovery is the same. Finally, to allow the receiver but not the corporation to sue would create the anomalous situation of allowing recovery only where the corporation becomes insolvent and enters receivership, while denying recovery by a going concern which suffered the same sort of injury.

III

In view of our holding that Lank has stated no claim for relief against the Exchange for violations of Section 6 of the Exchange Act, we do not reach the question of whether the three-year or the six-year statute of limitations applies.

The first certified question is answered in the negative.

Reversed and remanded for further proceedings not inconsistent with this opinion, with costs.